United States of America
District of Massachusetts

Suffolk, ss.

| | |
|---|---|
| James Lyons, Evelyn Curley, Henry Barbaro, Christine Doherty, David Lunger<br><br>v.<br><br>James Eldridge, Jonathan Paz, Wesley McEnany, and Maura Healey in her individual Capacity | Docket No._____ |

## Complaint

1. Plaintiff James Lyons is the Chairman of the Massachusetts Republican Party. He is a registered voter. He supports a referendum petition to repeal St. 2022, c. 81 the Act relative to Work and Family Mobility. Mr. Lyons has served as a signature gatherer for the referendum effort.

2. Plaintiff Evelyn Curley is an elected State Committeewoman of the Massachusetts Republican State Committee. She is a registered voter. She supports a referendum petition to repeal St. 2022, c. 81 the Act relative to Work and Family Mobility. She is a member of the ballot question committee. Mrs. Curley has served as a signature gatherer for the referendum effort.

3. Plaintiff Henry Barbaro, of Newton, is a registered voter and a signature gatherer supporting the referendum.

4. Plaintiff Christine Doherty, of Somerville, is a registered voter and a signature gatherer supporting the referendum.

5. Plaintiff David Lunger, of Acton, is a registered voter and a signature gatherer supporting the referendum.

6. Defendant James Eldridge is a resident of Acton. He is an elected public official but was not acting in that capacity in relation to the events herein related.

7. Defendant Jonathan Paz is a resident of Waltham. He is an elected public official but was not acting in that capacity in relation to the events herein related.

8. Defendant Wes McEnamy is a resident of Somerville. He is a union organizer but was not acting in that capacity in relation to the events herein related.

9. Defendant Maura Healey is the Attorney General of Massachusetts, she is sued herein in her individual capacity.

**Events at Issue**

10. On June 10, 2022, the Act relative to Work and Family Mobility, St. 2022, c. 81, became law over the veto of His Excellency Governor Baker.

11. The primary effect of the law is to remove the requirement of proving lawful residence in Massachusetts before the Registrar of Motor Vehicles may issue drivers' license to people.

12. On June 15, 2022, Mrs. Maureen Maloney, Mrs. Curley and at least 10 others filed a referendum petition seeking to challenge St. 2022, c. 81, by placing it upon the November General Election Ballot under the auspices of Article 48 of the Amendments to the Massachusetts Constitution, as amended.

13. On or about June 27, 2022, the Attorney General's Office produced the approved concise summary of the law and the referendum proponents were thereafter issued blanks for signature collection.

14. Under Article 48, as amended, to place a referendum on the law upon the ballot, the proponents must collect signatures amounting to 1.5% of the voters cast in the last governor's race.  Currently, this means that the referendum proponents need 40,120 voter signatures, not more than 25% of which can come from more than a single county.

15. Mr. Lyons, Mrs. Curley, and a legion of supporters and volunteers started undertaking to collect their 40,120 signatures.

16. This signature collection must be done within about 8 weeks.

17. Massachusetts, like many states, combines its general election with the federal general election for Congress in November.  Thus the ballot question, if successfully qualifying for the November 2022 election will be on the same physical ballot as federal elective offices.

18. To encourage interested voters to come and sign, on weekends the proponents have posted locations and hours where they have set up tables, manned by volunteers, to collect signatures.  They have set up tables outside of Cabelas, numerous Market Basket locations, as well as other stores.

19. Both the Massachusetts Constitution and the Federal Constitution protect the right to gather signatures in support of candidates or ballot questions.

20. The Massachusetts Constitution, under Article 9 of the Declaration of Rights, enhances this right by allowing for the collection of signatures upon private property such as

    shopping malls. <u>Batchelder v. Allied Stores International</u>, 388 Mass. 83 (1983) (*Batchelder I*).

21. Since the proponents of the referendum, and their supporters, have undertaken efforts to meet the gargantuan task of collecting signatures they have met organized resistance.

22. A concerted campaign of people have showed up, on more than a dozen occasions, to protest the signature collection. This campaign, with the catchy slogan "Decline to Sign," has harassed, intimidated, and prevented signature collection.

23. This campaign has exercised a heckler's veto over signature collection efforts, by physically blocking access to the signature tables, browbeating potential signers, harassing and even assaulting signature-gatherers. The campaign against signature gathering has seen counter-protests curse and swear at voters and signature-gatherers.

24. The campaign has also mastered the second portion of a heckler's veto in which first amendment activity, like signature collection, is stymied by a counter-protest which is disruptive enough that the police shut down all first amendment activities and orders everyone, including the initial speaker, to disperse. Thus, merely by showing up and making a nuisance of themselves, the campaign against signature collection can shut down signature gathering wherever and whenever they feel like simply by being obnoxious and disruptive.

25. The campaign against signature gathering, staffed by counter-protestors, is organized. It has managed to shut down signature-gathering efforts in Berlin, Tewksbury, Waltham, Haverhill, Plymouth, Hudson, and other locations.

26. Several volunteers have declined to be part of any further signature gathering efforts based on the vicious retaliation engaged in by the campaign against the referendum. One volunteer wrote "Based on this, I feel the risk to my family and my personal safety is significant enough that I'm gonna have to pull back from the [] signature gathering efforts."

27. The campaign against signature gathering has repeatedly been disruptive to the extent of requiring police intervention. The police have been understanding, but some officers who did not know better have ordered signature gathers to shut down their efforts, such as in Tewksbury.

28. The counter-protesters have been vicious. On at least one occasion a counter-protester came over and physically ripped the signature petitions in half before fleeing the scene. This act of physical destruction invalidates the collected signatures and actually blocks voter's rights to support petitions.

29. The campaign of counter-protestors apparently has shared guidance on how to effectively impede signature gathering, as several incidents have involved the counter-protestors

    physically blocking access to the signature tables and getting into the faces of voters who dare approach the signature tables.

30. On another occasion, the campaign against the referendum identified one of the signature gatherers and promptly doxxed her, publishing her home address and contact information online and welcoming any violence that might descend upon her. This volunteer has been scared away from any further signature gathering because of the targeted online harassment.

31. Other counter-protesters have attempted to intimidate the signature gathering volunteers by taking pictures of them, posting the pictures online, and asking the online mob to help identify and retaliate against the volunteers. Indeed one counter-protester remarked, online, in relation to a string which identified individually by name at least 6 signature gatherers from Waltham, "Massachusetts records are pretty accessible, I bet all these people have nice houses."

32. The campaign against the referendum has also pressured stores, commercial enterprises and managers to deny access to signature gatherers (in contravention of state law) because they feel negatively against the referendum effort. Many, but not all, of the pressured locations have resisted the pressure and continued to allow signature collection efforts.

**Further Allegations**

33. This litigation is parallel to similar but not overlapping claims between the same defendants and plaintiffs over similar but not identical claims, federal claims and those against Ms. Healey excepted.

34. Defendant Mr. McEnany appeared, on at least one occasion on July 10, 2022,, at the signature gathering effort in Tewksbury. Mr. McEnany physically blocked and prevented voters from any access to the signature collecting efforts, in a perfect exemplar of the conduct at issue here. He managed to impose his will and obstruct signature collection efforts, in addition to harassing voters.

35. James Eldridge has been a leader in the campaign of counter-protesters. He has appeared on several occasions to obstruct, harass, and intimidate voters and signature gatherers. Mr. Eldridge has, for example, obstructed and protested at a signature gathering event in Berlin. Mr. Eldridge has appeared, at least, on July 3rd and July 9th to impede signature collection.

36. Several people have written to Mr. Lyons to complain that Mr. Eldridge physically obstructed them from getting to the signature tables. Mr. Eldridge has also browbeat and yelled at voters who dared to sign the petition despite his obstruction. Mr. Eldridge, as recounted by the voter, would stand about three feet from the signature table and try to obstruction access. Should anyone go around him, they were informed that the was a state senator and thought that signing the petition was a bad idea.

37. Mr. Eldridge's efforts have been successful at depressing signature gathering, both compared to earlier efforts and compared to signature collection in other location.

38. Mr. Eldridge is a captain and organizer of the campaign to impede signature gathering.

39. Mr. Paz is also a leader in the campaign to impede signature gathering. On July 10th Mr. Paz and a group of counter-protesters descended upon a signature collection table in Waltham. Mr. Paz's group formed a picket line obstructing access to the signature table, about 5 feet in front of the table.

40. Mr. Paz's group was successful in getting signature collection shut down in Waltham.

41. Mr. Paz, when challenged on stifling political debate, wrote a soliloquy in favor of the right to counter-protest because free speech is a two-way street. Mr. Paz fails to appreciate that the right to reasonably and unobtrusively collect signatures on private property is not a two-way street but a limited imposition of a public duty on a non-public owner in the name of democracy. The use of Article 9 rights does not open the area as a public forum to debate and counter-debate.

42. Mr. Paz's misunderstanding of the rights of the referendum supporters, and its opponents, has caused him to impede, obstruct, and deny the referendum supporters their legal and constitutional rights.

43. Mr. Paz has appeared at least twice at the Waltham signature collection efforts to obstruct them.

44. Mr. Paz and Mr. Eldridge, and several others, known and unknown, have mounted organized efforts to physically obstruct access to signature collection tables, to intimidate voters from signing (especially by use of official roles), to harass signature collectors and induce them to drop out of their political efforts for fear of their physical safety or economic retaliation.

45. In pursuit of their goals, Mr. Paz and Mr. Eldridge and their confederates have used acts of physical destruction, physical intimidation, verbal harassment, the color of official authority, online harassment, doxxing, and other illegitimate and illegal tactics.

46. Mr. Paz and Mr. Eldridge and their confederates have acted with such reckless abandon because they fear that if the referendum efforts achieve the requisite number of signatures, their side of the political debate will lose at the ballot box.

47. Mr. Paz and Mr. Eldridge and their confederates are desperate to impede and obstruct signature collection because of the time-limited window (about 8 weeks) in which the referendum opponents have to collect signatures. Shutting down a signature collection effort for 12 hours at a location after a disruptive incident (which is Market Basket's policy) will prevent the petition from qualifying for the ballot, if repeated often enough in

enough locations.  Evidence shows that the organized campaign to impede signature collection is actively working to obstruct all signature collection efforts that they can manage.

48. In doing so, they have deprived the Plaintiffs, and the voters, of their constitutional and legal rights to sign ballot question petitions, to solicit signatures, and to seek to use the democratic process of the referendum to express their opinion at the ballot box.

**Count I—Civil Conspiracy to Deprive Persons of Civil Rights—42 U.S.C. §1985(3)**

49. Mr. Eldridge, Mr. Paz, Mr. McEnany and their confederate have conspired to, by threats and violence, deprive the Plaintiffs and the voters of their rights.

50. The conspiracy to appear at, and by heckler's veto shut down, signature collection efforts is a deliberate attempt by private actors to circumvent the public's right to place questions of legislation upon the ballot.

51. The conspiracy, and Mr. Eldridge, Mr. Paz, and Mr. McEnany's participation therein, aims to deprive the Plaintiffs of their equal rights and privileges to collect signature and seek political support.

52. The conspiracy, and Eldridge, Paz, and McEnany, invidiously discriminate against the Plaintiffs, taking no other common or concerted action and acting only with the express purpose of suppressing the Plaintiffs' first amendment freedoms.

53. The conspiracy, with the participation of Eldridge, Paz, McEnany and others, did go upon the property of others.

54. The conspiracy, consisting of at least two people and Messrs. Eldridge, Paz, and McEnany, have come out on multiple occasions for the purposes of impeding and shutting down signature collection, thereby depriving the Plaintiffs of the equal protection of the laws and their constitutional privileges.  On several of these occasions, the conspiracy has produced a police response which forcibly ended the signature collection efforts.

55. The acts of the conspiracy, including Mr. Eldridge, Mr. Paz, and Mr. McEnany, has resulted in both the denial of constitutional rights such as the ending of first amendment activities and signature collection, but has also resulted in property damage: the physical destruction of signature petitions in support of the referendum.

56. As alleged above, the conspiracy, with its above named individual participants, has proceeded by means of threats, coercion, physical intimidation, and destruction of signed referendum papers proceeded to deprive citizens of the United States of their constitutional rights.

57. The disruptive efforts of the conspiracy are deliberately designed to elict a police response, by disorderly conduct, and resultingly cause the government to shut down the signature collection efforts.

**Count II—Voter Intimidation Claim Against Mr. Paz and Mr. Eldridge and Mr. Enany**

58. Based on the aforementioned facts, Mr. Eldridge and Mr. Paz and Mr. McEnany have violated the rights of voters by intimidating them from exercising

59. Mr. Paz and Mr. Eldridge, and Mr. McEnany, and their confederates, have interfered by threats, intimidation or coercion with the exercise and enjoyment of the Plaintiffs' legal and constitutional state and federal rights in relation to the collection of signatures for their referendum petition.

60. Two federal laws prohibit voter intimidation in the context of elections, 52 U.S.C. §10101(b) and 52 U.S.C. §10307(b).  There is some case law, but not overwhelming authority, to support the idea that these statutes provide an individual private cause of action.

61. The Plaintiffs are entitled declaratory and equitable relief, as well as attorneys fees.

**Count III—Failure to Act Claim against Ms. Healey—42 U.S.C. §1986**

62. Repeating and reaffirming the above, the Plaintiffs plead against Ms. Healey for failing to prevent the §1985 conspiracy under §1986

63. 42 U.S.C. §1986 provides, in relevant part:

> Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured, or his legal representatives, for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented; and such damages may be recovered in an action on the case; and any number of persons guilty of such wrongful neglect or refusal may be joined as defendants in the action…

64. Maura Healey is aware of the §1985 conspiracy plead above.  The Plaintiffs, especially Mr. Lyons, made public pleas for the protection of their signature gathering efforts in advance of this last weekend.

65. Despite only having a few weeks, realistically a few weekends, in which to collect their 40,120 signatures, the §1985 conspiracy, led by Mr. Eldridge, has continued to haunt and harass signature collection efforts every weekend.

66. Ms. Healey has undertaken no "reasonable diligence" to prevent the conspiracy from effecting its aims. She has not undertaken any action at all. She has not publicly condemned the conspiracy and its suppressive effect upon democratic participation in the referendum. She has not provided any guidance or warning to police departments about the scope of the First Amendment and their obligations in a "heckler's veto" situation. She could, with a simple word or comment, clarify for the conspirators the nature of the laws and constitutional rights at issues, but had not.

67. In contrast to her extensive record of litigation in favor of progressive causes, particularly against the Federal Government, Ms. Healey generally does not exercise her authority to protect the political minority in Massachusetts—Republicans.

68. There is generally no federal law requirement that public officials or law enforcement undertake to enforce the laws. §1986 is a specific derogation, representing a congressional judgment that public officials must undertake specific action if it is within their power to prevent the private suppression of constitutional rights relating to the privileges and immunities or the equal protection of the laws.

69. Ms. Healey has not undertaken to abide her obligations to protect the civil rights of the Plaintiffs.

**Miscellaneous**

70. Personal jurisdiction is proper in Massachusetts

71. Based on the federal questions presented, the District of Massachusetts has jurisdiction.

72. Venue in the Boston Division is proper where some, if not the majority, of the incidents have occurred in Middlesex County.

Wherefore the Plaintiffs pray for any and all relief as the Court deems just and appropriate, including but not limited to:

- Equitable and Declaratory Relief relating to the rights of the Plaintiffs
- Damages for the suppression of the Plaintiff's civil rights.
- Attorneys fees as provided by statute
- Any other relief the Court deems fair and just.

Respectfully Submitted,

July 25, 2022

James Lyons et al

By their Attorney
<u>/S/ Michael Walsh</u>
Michael Walsh
BBO 681001
Walsh & Walsh LLP
PO Box 9
Lynnfield, MA 01940
617-257-5496